## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

**KENNETH MOSLEY**                                        **CIVIL ACTION**

**VERSUS**                                                        **NO.    16-13619**

**DARREL VANNOY, WARDEN**                          **SECTION: "N"(5)**

### <u>REPORT AND RECOMMENDATION</u>

This matter was referred to the undersigned United States Magistrate Judge to conduct a hearing, including an evidentiary hearing, if necessary, and to submit proposed findings and recommendations for disposition pursuant to 28 U.S.C. § 636(b)(1)(B) and (C), and as applicable, Rule 8(b) of the Rules Governing Section 2254 Cases in the United States District Courts.    Upon review of the entire record, the Court has determined that this matter can be disposed of without an evidentiary hearing.    *See* 28 U.S.C. § 2254(e)(2). For the following reasons, **IT IS RECOMMENDED** that the petition for *habeas corpus* relief be **DISMISSED WITH PREJUDICE**.

### Procedural History

Petitioner, Kenneth Mosley, is a convicted inmate currently incarcerated at the Louisiana State Penitentiary in Angola, Louisiana.    On January 17, 2008, he was indicted for aggravated rape and sexual battery of a juvenile under 13 years of age and forcible rape of another minor victim.[1]    On February 17, 2011, a jury found him guilty as charged.[2]    On

---

[1]  State Rec., Vol. 2 of 10, Grand Jury Indictment.

[2]  State Rec., Vol. 3 of 10, Minute Entry, 2/17/11.

April 8, 2011, the trial court denied his motions for a new trial and for post-verdict judgment of acquittal.    He was sentenced to life imprisonment, 99 years imprisonment and 40 years imprisonment, respectively, all without benefit of probation, parole or suspension of sentence, to run concurrently.[3]

On direct appeal, Mosley asserted that the trial court erred in allowing the state to introduce evidence of other crimes that were not only un-adjudicated, but were uncorroborated by any physical evidence, and "unnoticed" evidence of other crimes by Mosley that the State knew of before trial.    On March 13, 2013, the Louisiana Fourth Circuit Court of Appeal affirmed all three convictions and the sentences for aggravated rape and forcible rape.    The court of appeal vacated the sentence imposed for sexual battery, finding an error patent, and remanded for resentencing consistent with the opinion.[4]    On November 8, 2013, the Louisiana Supreme Court denied his application for a writ of certiorari.[5]

On or about October 6, 2014, Mosley submitted an application for post-conviction relief to the state district court.[6]    In that application, he raised two claims:    (1) trial

---

[3]  State Rec., Vol. 3 of 10, Minute Entry, 4/8/11.

[4]  *State v. Mosley*, 2011-KA-1514 (La. App. 4 Cir. 3/13/13) (unpublished); State Rec., Vol. 7 of 10.    The trial court resentenced him on the sexual battery count to 10 years imprisonment at hard labor without benefit of probation, parole, or suspension of sentence. *See* State Rec., Vol 2 of 10, Docket Master, 4/18/13.

[5]  State Rec., Vol. 10 of 10, *State v. Mosley*, 2013-KO-0842 (La. 11/8/13), 125 So.3d 441.

[6]  State Rec., Vol. 9 of 10, Application for Post-Conviction Relief.

counsel prevented him from testifying at trial and (2) trial counsel was ineffective for failing to object to the jury instructions on general and specific intent.    He thereafter supplemented the application to raise a third claim:    (3) the State suborned perjury.    On December 15, 2014 the district court denied post-conviction relief.[7]    On May 8, 2015, his related supervisory writ application was granted, but relief denied, by the Louisiana Fourth Circuit Court of Appeal.[8]    On May 20, 2016, his supervisory writ application to the Louisiana Supreme Court was denied.[9]

On August 2, 2016, Mosley filed his federal application for *habeas corpus* relief.[10]  In that petition, he raises the same three grounds for relief presented on collateral review. The State concedes that he has exhausted his remedies in the state courts and that the federal application is timely.    The State argues for dismissal on the merits.[11]

## Facts

The following facts were established at trial and summarized by the Louisiana Fourth Circuit Court of Appeal:

T.P.B., mother of the two victims, testified that C.P.1's birthday was April 2,

---

[7]  State Rec., Vol. 1 of 10, State District Court Post-Conviction Relief Order signed December 15, 2014.

[8]  State Rec., Vol. 9 of 10, *State v. Mosley*, 2015-K-0120 (La. App. 4 Cir. May 8, 2015) (Lombard, J. Dissents); *see also* Rec. Doc. 3-4, p. 10.

[9]  State Rec., Vol. 10 of 10, *State ex rel. Mosley v. State*, 2015-KH-1103 (La. 5/20/16), 191 So.3d 569; *see also* Rec. Doc. 3-4, p. 43.

[10]  Rec. Doc. 3, Petition under 28 U.S.C. § 2254 for Writ of Habeas Corpus.

[11]  Rec. Doc. 15.

1992, and that C.P.2's birthday was November 26, 1993. T.P.B. stated that C.P.2 was a school friend of defendant's daughter, K.R. T.P.B. recalled a day in June 2006 when defendant came to her home and picked up C.P.1 to take C.P.1, C.P.2, K.R., and other girls to see a Lil' Wayne concert and to spend the night at defendant's home.

T.P.B. testified that her daughters first made allegations of improper contact in August 2007. T.P.B. subsequently went to the New Orleans Police Department's Fourth District Police Station to report the allegations. After T.P.B. took her daughters to see a doctor, she learned that C.P.1 was pregnant.

T.P.B. admitted on cross examination that another young man was the father of C.P.1's child. She knew the father of the child very well, but did not report him to police for having sex with C.P.1 because it was consensual. T.P.B. confirmed on redirect examination that C.P.1 told her with whom she had been sexually active and maintained that C.P.1 never accused anyone of raping her in connection with that pregnancy.

C.P.2 testified that in 2006, K.R., defendant's daughter, was her best friend. C.P.2 identified defendant in court. She spent the night several times at defendant's residence. She and K.R. would go places with defendant, such as to the homes of his friends and to wave pools. However, she said she was no longer friends with K.R. because defendant raped her in the summer of 2006.

C.P.2 testified that sometime in the summer of 2006, defendant picked her up alone to go to a wave pool with K.R. and some other friends. They drove to a store en route to pick up K.R. While sitting at the store in defendant's car, he rubbed C.P.2 under her shirt, pulled her pants to the side, and touched her vagina. She began crying, and he stopped. She did not do anything to physically resist him. She did not tell anyone or call anyone when it happened because she was embarrassed and scared. C.P.2 testified that she did not really understand what he was doing to her.

C.P.2, K.R, and some other girls returned to defendant's residence after they could not get into the wave pool. The other girls eventually left and K.R. went to spend the night with her mother. C.P.2 remained to spend the night at defendant's residence with defendant and his wife.

Sometime around midnight, defendant awakened C.P.2 and told her to come into the living room with him. Defendant sat on the couch and she sat on the floor. After they talked for a while, defendant told her to sit on the sofa with him, whereupon he took out his penis and started to masturbate. Defendant

grabbed her hand and made her put it on his penis and move it in an up and down motion until he ejaculated. After wiping his penis, he placed a towel on the sofa and made C.P.2 lie down on the sofa. He removed her pants and underwear and inserted his penis into her vagina. She began crying and told him to stop because it hurt. Defendant removed his penis, wiped her vagina, and then performed oral sex on her. She told him to stop. When he stopped, he made her wipe her vagina in the bathtub while he brushed his teeth. Afterwards, she returned to K.R.'s room and went to sleep. The next day, she did not tell K.R., her parents, her sister, or anyone else what happened because she did not want anyone to judge her. She said she felt like a whore.

C.P.2 estimated that the above incident happened about two weeks before the Lil' Wayne concert. Believing that the molestation would not happen again, she returned to defendant's residence. She said that defendant drove K.R., several other friends, and C.P.2 to pick up her sister, C.P.1. C.P.2 recalled that the concert was for the following night and that the girls planned to stay at defendant's house.

After they returned to defendant's house, the other girls left, leaving C.P.1, C.P.2., and K.R. Defendant told K.R. and C.P.2 to go into a room. He put on a pornographic tape and made them watch it, telling them not to come out of the room. C.P.1 was in the living room at that time. C.P.2 next saw C.P.1 in the bathroom, sitting on the toilet, making a face. C.P.2 said C.P.1 wanted to cry at that point, but did not. She said defendant left his apartment at some point that night and drove to pick up "T", C.P.1's former boyfriend, whom he brought to the apartment. "T" slept there. C.P.2 testified that they spent the night at defendant's residence and left the next day, when her aunt, her mother's sister, picked them up.

Approximately one year later, C.P.1 told her what happened to her, saying that she was having nightmares. After her sister told her what happened to her, she told C.P.1 what defendant had done to her. They both then told their mother when they came home from school the next day. Subsequently, the sisters talked to the police, were interviewed by a woman, and examined by a physician. C.P.2 did not know C.P.1 was pregnant before they went to the doctor. C.P.2 testified that she was twelve years old when these events occurred in the summer of 2006. She did not know precisely what rape meant, and so she told her mother that she had not been raped. At the time, she thought rape meant full insertion of the penis accompanied by "pumping" movements. She testified that she told her mother that defendant did something to her, just that he had not raped her.

Her older sister, C.P.1, testified that defendant raped her around the time of the Lil' Wayne concert in the summer of 2006. Defendant picked her up and took K.R., her sister, and some other friends to a McDonald's. Then he took the girls to a daiquiri shop and bought them daiquiris, although he claimed the drinks were alcohol-free.

Once they returned to defendant's residence, he said he needed to discuss "house" rules with her. However, defendant then started to talk about sex and lubricants with her. Defendant eventually took her down to his car. He discussed making his daughter watch pornography. C.P.1 testified that she initially was sitting on the rear seat with her leg in the open door, but defendant told her to put her leg inside so he could close the door. She did so. Defendant then locked all the doors. She panicked, but he calmed her by saying that it was just dangerous in that area.

Defendant continued to discuss sexual matters, placed his hands on her thighs, and told her to pull her shorts down. C.P.1 told him no and tried to open the car door. Defendant eventually removed her pants, put on a condom, and raped her. She said it lasted about ten minutes. She testified she was really scared and wondered if defendant would kill her after raping her. She said she screamed and cried out; although on cross examination, she qualified her testimony by stating that she did not scream at the top of her lungs. Defendant told her to shut up. C.P.1 relayed that he finally stopped raping her when a female apartment resident turned on her light, came outside, and began talking. C.P.1 said that at that point, defendant jumped off of her and pulled up his pants and told C.P.1 to pull up hers. She said she was in pain. Defendant told her to wipe her face. He threatened her by saying that she better not say anything because he knew where she and her sister lived, and/or where her friends lived.

C.P.1 went back up the stairs because her sister was there. However, defendant would not let her go inside until she stopped crying. She estimated that she stood there for thirty minutes until he finally let her go back inside of the apartment. After C.P.1 went into the bathroom, she noticed vaginal bleeding.

Defendant took a shower and then left. He returned with "T", C.P.1's boyfriend. She did not tell "T" that she had been raped, but did tell him about how defendant was talking about lubricants and condoms. C.P.1 testified that she had never had sex with "T".

C.P.1 did not tell "T" about the rape until everything came out a year later. C.P.1 said her aunt told "T" about the rape. She said that he revealed that defendant

had called him and asked him to say that he, "T", had raped her, because defendant said he could not go back to jail. C.P.1 testified that she finally told her sister, C.P.2, about the rape one night when she awoke from a nightmare about the rape. C.P.1 said C.P.2 then told her defendant had tried to touch her, but she started crying and he left her alone. They told their parents the next night.

C.P.1 did not know she was pregnant when she told her mother that she had been raped. She did not discover her pregnancy until after they had talked to detectives about the rape and after she had been examined by a physician. C.P.1 testified that defendant took her virginity when he raped her. She said her subsequent boyfriend, "D", impregnated her. He was the only person with whom she had had consensual sex at that time. C.P.1 stated on cross examination that the reason she had sex with her boyfriend was because defendant made her feel "nasty" and that sex was her means of acting out.

Dr. Yameika Head was qualified by joint stipulation as an expert in the field of child abuse pediatrics. Dr. Head testified that there are many reasons for delayed disclosure of sexual abuse by a child, including embarrassment, feeling a little bit guilty about it, or being threatened not to tell. Dr. Head detailed the procedure she followed with C.P.1 and C.P.2 when she interviewed and examined them on September 4, 2007. Dr. Head stated that C.P.1 gave a history of penile-vaginal contact by her friend's father. Dr. Head stated that C.P.1's physical findings were consistent with C.P.1's history. She acknowledged that tests showed that C.P.1 was pregnant.

Dr. Head testified that C.P.2 had the same evaluation and comprehensive physical examination as C.P.1. C.P.2 related a history of penile-vaginal contact, digital-vaginal contact, oral-vaginal contact, and oral-oral contact, by her friend's father. Dr. Head said that C.P.2 had a normal physical examination that was consistent with the history given.

New Orleans Police Department Detective Kurt Coulon was assigned to the sex crimes unit in August 2007. He became involved in the case after the victims and their parents went to the Fourth New Orleans Police District Station. He referred them to the Children's Advocacy Center (CAC) for a forensic interview. He later obtained three warrants for defendant's arrest based on his investigation and the forensic interviews.

JoAnn Verrett, a forensic interviewer for the Child Advocacy Center, conducted interviews of C.P.1 and C.P.2 in September 2007. Ms. Verrett testified that she had formerly worked for the New Orleans Police Department for twenty-five

years and had been a child abuse detective. She identified videotapes or DVDs of her separate interviews of C.P.1 and C.P.2, which were played for the jury.

E.P was the mother of B.P., a friend of both victims. She also had met defendant on one occasion, when he came to her home with her daughter, B.P., defendant's daughter, K.R., and I.G., another friend, to ask if B.P. could go to the Lil' Wayne concert in June 2006. She did not permit B.P. to go to the concert because she did not know the defendant. However, she did give permission for BP to go to defendant's house with the other girls.

B.P. confirmed that in 2006, she was friends with C.P.1 and C.P.2. She also knew K.R.; they were not friends, but went to school together. She met defendant once, in June 2006. B.P. identified defendant in court. She testified that on the day after the Lil' Wayne concert, defendant and his daughter took B.P. and her friend, I.G., to defendant's residence. After the girls "chilled" for a couple of hours, she had an uncomfortable incident with defendant which caused her to leave.

B.P. stated that she, I.G., and K.R. were about to go out on the balcony, when defendant either called her or came to get her, and they went to his bedroom. Defendant said he wanted to talk, and he told her she could close the door. She said he could keep the door open. She asked him what he wanted to talk about, and he told her to sit on the bed. He sat next to her, but not too close. Defendant began asking her if she was an only child, how she was doing in school, and if she had a boyfriend. Defendant then asked her if she knew anything about condoms and lubricants.

B.P. testified that defendant had started to get a little closer as he was talking to her about sex. He then asked her to lie down, open her legs, and told her he was going to insert his fingers into her vagina. Defendant rested his hand on her thigh, and she pushed it off. He touched her shoulder, and she told him not to touch her. She testified that at that point, she got up. B.P. called him a pervert and threatened to call her father. Defendant said: "No, it is not anything like that. It is not anything like that." She did not tell anyone that day about what happened. She said she wanted to forget about it.

B.P. did not talk about the incident until C.P.1 and C.P.2 revealed what defendant had done to them. B.P. was present at the home of C.P.1 and C.P.2 when C.P.1 began crying and talking about having nightmares. B.P. asked what she was having nightmares about, and C.P.1 told her that defendant had raped her. C.P.2 then stated that defendant had done it to her also. B.P. then told the sisters about her experience with defendant. The three girls went to the front

of the residence. The sisters' mother asked them why they were crying. B.P. said that was when it all came out. B.P. testified that because C.P.1's stomach was showing, she knew C.P.1 was pregnant at the time C.P.1 divulged that defendant had raped her. However, she did not recall C.P.1 actually telling her she was pregnant.

B.A.2, fifteen years old at the time of trial, testified that defendant was the father of her brother, "B." She first met defendant ten years earlier, when "B" was born. B.A.2 verified that defendant spent time in her residence in 2004. She described an incident that happened with defendant when she was nine years old. She stated that defendant touched her between her legs. He then picked her up and put her on top of him; and he made her "hump" him. He stopped after her sister, B.A.1, came downstairs to check on her. After she went upstairs, her sister asked if defendant had been touching her.

B.A.2 added that she did not know C.P.1, C.P.2, or B.P. B.A.2 acknowledged that she was introduced to B.P. at the District Attorney's Office, but maintained she did not know anything about B.P.

B.A.1, twenty-one years old at the time of trial, testified that she had one brother, "B", and two sisters, B.A.2 and B.A.3. B.A.1 identified defendant in court as the father of her brother, "B". In 2004, when B.A.1 was thirteen years old and living with her mother, B.A.2, and "B", she saw defendant frequently at their apartment. On one occasion in December 2004, at approximately 11:00 a.m. or noon, she saw her sister, B.A.2, on top of defendant. She stood where they could not see her and watched to see what they were doing. B.A.1 said defendant had his hands on B.A.2's waist and he was moving her back and forth like one would do having sex. Her private part was touching his private part, although both were fully clothed. B.A.1 went back upstairs and called B.A.2 upstairs. She asked B.A.2 what happened, telling B.A.2 she had seen what B.A.2 had been doing with defendant. B.A.2 began crying. B.A.1 eventually told her mother about the incident.

On cross examination, defense counsel asked B.A.1: "And you don't claim Mr. Mosley ever played ride the horsey or anything like that with you, do you?" She replied "no." On redirect examination, the prosecutor asked B.A.1 if she knew what defense counsel had meant when he asked her if she had ever "rode the pony" with defendant. She asked the prosecutor if defense counsel "was talking about on top of him?" When the prosecutor replied in the affirmative, B.A.1 answered "no."

The prosecutor then asked B.A.1 if defendant had ever touched her, and she

replied that he began touching her when she was ten years old. The first incident occurred when she was in her mother's bed with her sister and her brother. She testified that defendant was at their residence when her mother left to get drugs. Defendant got into bed with her, her sister B.A.2, and her brother. He then touched her between her legs and played with himself until he ejaculated. She said she did not know what had just happened. She did not do anything about it because she felt that no one would believe her, and because her mother was on drugs.

B.A.1 testified that defendant molested her again while she was still ten years old, under the same circumstances. She said her mother was always leaving. She said that on that second occasion, defendant did the same acts—touching her while playing with himself. He had a white towel. B.A.1 said this happened three times. She finally told her grandmother about the abuse when she was seventeen years old. B.A.1 said she did not tell her mother because her mother was going through "the situation" with B.A.2. She finally told her mother in 2010. B.A.1 said that when she was interviewed about what happened to B.A.2 she did not tell anyone what had happened to her. She did not say anything at that time because she said that when she told someone about B.A.2, "they" thought she was making it up. Consequently, she said she knew "they" would not believe her if she told them that it had happened to her.

K.R., defendant's daughter, was called as a defense witness. K.R. denied that defendant had K.R. or her friends watch porn films. She claimed that her father did not encourage her to have sex and denied that he taught her about condoms or lubricants. Defendant never bought alcohol for her or her friends.

K.R. claimed that she was not sexually active and that she knew of no instances where defendant picked up her junior high school friends so they could have sex in her room. K.R. testified that defendant would never hurt her and that he never touched any of "them." She first learned of the accusations against defendant by C.P.1 and C.P.2 on the news. Since then, she has not spent any time with C.P.1 or C.P.2; they stopped talking.

A.C., a friend of K.R., also testified that she was never shown any pornographic films by defendant. She maintained that he did not buy her alcohol or have her touch his penis. She never saw defendant do anything inappropriate with any of the girls. However, she admitted that she was never at defendant's house when C.P.1, C.P.2, or B.P. was there.

I.G., a friend of C.P.1, testified. She said she went to the Lil' Wayne concert at the Alario Center; however, she did not see C.P.1 or C.P.2 there. Afterwards,

she went home to get clothes to spend the night at defendant's residence. Her friend, B.P., also came to defendant's residence.

I.G. did not recall precisely when C.P.1 had warned her that defendant was a rapist. She testified that C.P.1 and she had gotten into a fist fight about the rape allegations. I.G. added that defendant never showed her pornographic films, raped her, fondled her, or said anything lewd or sexual to her. He never gave her alcohol or a daiquiri. However, she acknowledged that she was never alone in defendant's presence.

NOPD Detective Kurt Coulon was recalled as a witness by defendant. He said that his supplemental police report of August 27, 2007 showed that C.P.1 identified that she was assaulted on the day in 2006 when defendant picked her up to attend the Lil' Wayne concert. His report also stated that C.P.2 told him she was assaulted the night before the Lil' Wayne concert. Det. Coulon testified that he attempted to talk to K.R., but her mother would not permit it. He admitted that no one revealed to him that C.P.1 was pregnant. Det. Coulon did not interview any of the other girls that he had been told were raped or molested by defendant.

Det. Coulon confirmed on cross examination by the State that no one ever came to him and said C.P.1 and C.P.2 lied about their allegations against defendant. He said that C.P.1, C.P.2, and B.P. related the allegations against defendant on August 27, 2007; and on that date, he attempted to contact defendant, but was unable to do so.

When recalled to testify by defendant, T.P.B. said that her daughters and B.P. were not crying or hysterical when they made the allegations against defendant. She reiterated that she did not discover C.P.1 was pregnant until after the doctor's examination. She said C.P.1 told her she did not know herself that she was pregnant until that time.

The final witness for the defense was Ed Bolger. Bolger testified that he ran the Federal Bureau of Prisons, United States Department of Justice, Reentry Program, a halfway house program. He testified that paperwork he received from the United States Probation Office reflected that defendant was first placed in custody in October 2001. Thereafter, he was in Bolger's custody from October 15, 2004, with an anticipated release from incarceration date of February 14, 2005. Bolger testified that during those four months defendant was in his custody, defendant would have been under the community custody component ("CCC") of the program for two months, during which time he would have only been allowed to leave the facility to look for work or begin a

job search.

Bolger advised that he could not state if he knew where defendant was at all times or if he actually went to all jobs sites where he might have applied for work. Bolger also confirmed that he had no records showing where defendant was during November or December of 2004, while he was in his custody.[12]

### Standards of Review on the Merits

Title 28 U.S.C. § 2254(d)(1) and (2), as amended by The Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), provides the applicable standards of review for pure questions of fact, pure questions of law, and mixed questions of both.    A state court's purely factual determinations are presumed to be correct and a federal court will give deference to the state court's decision unless it "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(2); *see also* 28 U.S.C. § 2254(e)(1) ("In a proceeding instituted by an application for a writ of *habeas corpus* by a person in custody pursuant to the judgment of a State court, a determination of a factual issue made by a State court shall be presumed to be correct. The applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence.").    With respect to a state court's determination of pure questions of law or mixed questions of law and fact, a federal court must defer to the decision on the merits of such a claim unless that decision "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1).

---

[12] State Rec., Vol. 1 of 10, *State v. Mosley*, 2011-KA-1514 (La. App. 4 Cir. 3/13/13), 2013 La. App. Unpub. LEXIS 185.

The "'contrary to' and 'unreasonable application' clauses [of § 2254(d)(1)] have independent meaning." *Bell v. Cone*, 535 U.S. 685, 694 (2002).    A state court decision is "contrary to" clearly established precedent if the state court applies a rule that contradicts the governing law set forth in the United States Supreme Court's cases or if the state court confronts a set of facts that are materially indistinguishable from a decision of the United States Supreme Court and nevertheless arrives at a result different from United States Supreme Court precedent.    *Williams v. Taylor*, 529 U.S. 362, 405–06 (2000); *Wooten v. Thaler*, 598 F.3d 215, 218 (5th Cir.), *cert. denied*, 131 S.Ct. 294 (2010).    An "unreasonable application" of [United States Supreme Court] precedent occurs when a state court "identifies the correct governing legal rule... but unreasonably applies it to the facts of the particular state prisoner's case."    *Williams*, 529 U.S. at 407-08; *White v. Woodall*, 134 S.Ct. 1697, 1706 (2014).

It is well-established that "an unreasonable application is different from an incorrect one." *Bell*, 535 U.S. at 694.    A state court's merely incorrect application of Supreme Court precedent simply does not warrant *habeas* relief.    *Puckett v. Epps*, 641 F.3d 657, 663 (5th Cir.2011) ("Importantly, 'unreasonable' is not the same as 'erroneous' or 'incorrect'; an incorrect application of the law by a state court will nonetheless be affirmed if it is not simultaneously unreasonable.").    "[E]ven a strong case for relief does not mean the state court's contrary conclusion was unreasonable" under the AEDPA.    *Harrington v. Richter*, 562 U.S. 86, 102 (2011).    Section 2254(d) preserves authority to issue the writ in cases where there is "*no possibility* fairminded jurists could disagree that the state court's decision

conflicts with [United States Supreme Court] precedents."    *Harrington*, 562 U.S. at 102

(emphasis added); *see also Renico v. Lett*, 559 U.S. 766, 130 S.Ct. 1855, 1866 (2010) ("AEDPA

prevents defendants—and federal courts—from using federal *habeas corpus* review as a

vehicle to second-guess the reasonable decisions of state courts.").

## Analysis

A. *Prosecutorial Misconduct*

Mosley claims that the State knowingly presented the false testimony of a witness at

trial.[13]    The state district court rejected the claim as meritless on post-conviction review.

The state appellate court rejected the claim as repetitive under Louisiana Code of Criminal

Procedure article 930.4 (A) ("[u]nless required in the interest of justice, any claim for relief

which was fully litigated in an appeal from the proceedings leading to the judgment of

conviction and sentence shall not be considered").    The Louisiana Supreme Court likewise

denied the claim as repetitive.

The State observes that the ruling of repetitiveness under article 930.4(A) is

problematic in that the prosecutorial misconduct claim was not raised on direct appeal.

The only claim raised by appointed counsel involved the alleged improper admission of

---

[13]    To the extent Mosley is also arguing that the trial court erroneously denied his motion for mistrial, that claim does not implicate an independent, cognizable federal constitutional right.    *See Haygood v. Quarterman*, 239 F. App'x 39, 42 (5th Cir. 2007). Rather, the motion involved issues of state law, and it is clear that a federal court does "not sit as [a] 'super' state supreme court in a habeas corpus proceeding to review errors under state law."    *Wilkerson v. Whitley*, 16 F.3d 64, 67 (5th Cir. 1994) (citation and quotation omitted); *see Swarthout v. Cooke*, 562 U.S. 216, 219 (2011) (federal *habeas* review does not lie for errors of state law).

other crimes evidence at trial, *i.e.*, acts by Mosley involving then-minor females, including the witness at the heart of this prosecutorial misconduct claim—"B.A.1" and her younger sister, "B.A.2". These are distinct claims.    Therefore, subpart (A) would not seem to apply under the circumstances.    Furthermore, even if it did apply, "the bar imposed by article 930.4(A) is not a procedural bar in the traditional sense, nor is it a decision on the merits."    *Bennett v. Whitley*, 41 F.3d 1581, 1583 (5th Cir. 1994).    Therefore, the bar does not preclude federal *habeas* review of the claims; rather, the federal court simply "look[s]-through" such decisions and considers relevant findings made on direct appeal.    *Id.* at 1582-83; *see also Krodinger v. Kent*, Civ. Action No. 16-2069, 2016 WL 7191684, at *5 (E.D. La. Sept. 30, 2016) (Wilkinson, M.J.), *adopted*, 2016 WL 7187948 (E.D. La. Dec. 12, 2016) (Barbier, J.).    The State further notes that subpart (C) more logically applies, *i.e.*, if the application alleges a claim which the petitioner raised in the trial court and inexcusably failed to pursue on appeal, the court shall deny relief; however, that was not the basis of the state courts' ruling.    In light of the confusion, the State argues "[b]ecause Mosley's perjury claim is plainly without merit, however, it is ultimately immaterial whether it is considered to be defaulted as well."[14]    For this reason, the Court will pretermit the procedural-default issue and consider the merits of the claim.

The State offends due process if a prosecutor knowingly uses false testimony at trial or allows untrue testimony to go uncorrected.    *Giglio v. United States*, 405 U.S. 150, 153 (1972); *Napue v. Illinois*, 360 U.S. 264, 269 (1959); *Faulder v. Johnson*, 81 F.3d 515, 519 (5th

---

[14]  Rec. Doc. 15, p. 7.

Cir. 1996).    However, a petitioner is entitled to relief on such a claim only if he shows that (1) the testimony in question was actually false, (2) the prosecutor knew it was false, and (3) the testimony was material.    *Duncan v. Cockrell*, 70 F. App'x 741, 744 (5th Cir. 2003). "Evidence is 'false' if, *inter alia*, it is specific misleading evidence important to the prosecution's case in chief.    False evidence is 'material' only if there is any reasonable likelihood that it could have affected the jury's verdict."    *Id*.

Mosley's factual contention with respect to the alleged perjured testimony appears to be twofold.    He contends that State witness, B.A.1, testified falsely regarding one incident involving her younger sister, B.A.2, being sexually molested by Mosley in December 2004, and also with respect to allegations that B.A.1 herself was sexually molested by Mosley between 2001 and 2003.    The specific testimony offered by these witnesses was set forth previously in this report.    Mosley argues that B.A.1's testimony was false and that prosecutors knew it was false because Mosley was in federal custody on the dates the witness testified the molestation occurred.

In denying the factually related "other crimes" evidence claim on direct appeal, the appellate court made the following findings, which prove useful in understanding the nature of B.A.1's testimony and how it was adduced:

> Defendant next argues that the trial court erred in permitting the State to question B.A.1 about defendant's molestation of her, given that the State did not give pre-trial notice of these acts, as required by La. C.E. art. 412.2(B). Defendant maintains that the State set a trap to have his trial counsel "open the door" to B.A.1's molestation allegations. Defendant also urges that the trial court improperly denied his motion for a mistrial after it permitted the State to examine B.A.1; defendant avers that the defense did not have sufficient time to meaningfully prepare to examine B.A.1 on these prior bad acts and/or to

review reports regarding her molestation claims.

The State does not dispute that it did not give such pre-trial notice of the acts involving B.A.1, or that defendant had requested such reasonable notice. *However, it represents that the State did not provide notice because it did not have sufficient notice of B.A.1's molestation claims in advance of trial to file a La. C.E. art. 412.2 notice. The State contends that its direct examination of her showed that it did not intend to introduce B.A.1's molestation claims into evidence for purposes of the notice requirements of La. C.E. Article 412.2. Instead, the State maintains that it only questioned B.A.1 as to any potential molestation acts after defense counsel opened the door to such questioning.*

Our review of the record supports the State's position. On direct examination, the State asked B.A.1 to testify solely as to an act that she witnessed defendant perpetrate on her younger sister, B.A.2. On cross-examination, defense counsel asked B.A.1: "And you don't claim Mr. Mosley ever played ride the horsey or anything like that with you, do you?" After B.A.1 responded "no," the prosecutor, on redirect examination, then asked B.A.1 if she knew what defense counsel meant when he asked her if she had ever played "ride the pony" with defendant. When she indicated that she had not been on "top of him," the prosecutor then asked if defendant had ever touched her, which triggered an objection by defense counsel.

Defendant suggests that the State intended all along to set a trap for his defense counsel in order to "open the door" to B.A.1's allegations, with the expectation that it would get B.A.1's unnoticed allegations before the jury. Defendant asserts that the State's "ready" argument that the defense had opened the door is to question B.A.1 about her own molestation claims is evidence the State had been prepared for this trap to be sprung.

La. C.E. art. 611(A) states that a trial court shall exercise reasonable control over the mode and order of interrogating witnesses so as to, *inter alia*, make the interrogation and presentation effective for the ascertainment of the truth. La. C.E. art. 611(D) states that "[a] witness who has been cross examined is subject to redirect examination as to matters covered on cross examination." La. C.E. art. 611(E) states that the State in a criminal prosecution shall have the right to rebut evidence adduced by their opponents.

Louisiana courts routinely reject assignments of errors on appeal concerning instances where trial courts have allowed the State to question witnesses as to matters it otherwise would not have been permitted to delve into, holding that respective defense counsel "opened the door" to such questioning. *See*

*State v. Manning*, 2003-1982, p. 59 (La. 10/19/04), 885 So. 2d 1044, 1097 (defense "opened the door" to State bringing up at sentencing hearing otherwise prohibited evidence of the defendant's other crimes when cross examining a witness whose report contained that other crimes information and which report the defendant had introduced in evidence—citing, *inter alia*, then Comment (c) to La. C.E. art. 607 ("new evidence code does not change the traditional policy, based on waiver and fair play, permitting freer admissibility of extrinsic evidence after an adverse party has "opened the door" to otherwise inadmissible evidence")); *State v. Taylor*, 2001-1638, pp. 17-18 (La. 1/14/03), 838 So. 2d 729, 745-746 (defense counsel's opening statement comment that the defendant had no previous knowledge of how to use firearms "opened the door" to the State's cross examination of the defendant regarding his alleged gun ownership—what the defendant argued was impermissible other crimes evidence); *State v. Robinson*, 2009-1137, pp. 7-8 (La. App. 4 Cir. 3/24/10), 33 So. 3d 1019, 1023 (defense counsel's questioning of his own witness concerning the defendant's good deeds "opened the door" for the State to ask the witness if she knew of the defendant's prior criminal convictions, citing La. C.E. art. 611 and *State v. Koon*, 96-1208, p. 25 (La. 5/20/97), 704 So. 2d 756, 771-772 ("The State has the right to rebut testimony elicited from a witness by the defense.") ); *State v. Lagarde*, 2003-0606, p. 17 (La. App. 4 Cir. 12/10/03), 861 So. 2d 871, 882 (defense "opened the door" to State's cross examination of its expert witnesses as to the defendant's failure to request DNA testing of evidence, where the defense had questioned why DNA testing had not been performed on the evidence—"the questions were posed to rebut the implication of the state being sloppy in failing to request such DNA testing.").

Similarly, in the instant case, the trial court properly permitted the State to question B.A.1 on redirect examination about defendant's molestation of her to rebut evidence defense counsel obtained from her cross examination that inferred that defendant had never molested her. Our review of the record does not support defendant's claim that the State improperly misled defense counsel or set a trap for him so that it could introduce this "unnoticed" sexually assaultive/lustful disposition testimony from B.A.1.

Defendant also presents no legal argument to support his contention that the trial court erred in denying his motion for mistrial. The record shows only that defense counsel asked for a recess and requested any reports, documentation, tape recordings, etc. pertaining to B.A.1, "so we can be prepared, without any time, to cross examine her." The trial court allowed the trial to continue after the State indicated that it did not have any such records and subsequently, denied defendant's motion for a mistrial. *Defendant cites no evidence in the*

*record to show that the State had any report, documentation, tape recordings, etc. pertaining to B.A.1's molestation allegations.* Instead, the record reflects that defense counsel thoroughly cross examined B.A.1 as to her allegations of molestation by defendant. Additionally, in its case in chief, the defense called Ed Bolger, who testified that defendant was incarcerated in 2001 and that defendant was in his custody in a federal "halfway house" from October 15, 2004, with an anticipated release date of February 14, 2005. Hence, the jury had Bolger's testimony before it to decide if his testimony undermined B.A.1's timeline as to when she witnessed defendant engage in inappropriate acts with her sister, B.A.2, in 2004, as well as B.A.1's credibility in general.

Therefore, when we review all the facts and evidence presented, defendant fails to demonstrate substantial prejudice to his defense counsel's ability to provide an adequate defense after the trial court allowed the trial to continue, permitted the State to question B.A.1 about her molestation claims, and denied defendant's request for a mistrial.

Accordingly, we find no merit to defendant's claim that the trial court erred in allowing testimonial evidence of other crimes to be introduced at trial.[15]

On the record presented, Mosley cannot show that the testimony was false, or more importantly, that the prosecution was aware in any event of such alleged false testimony. The evidence Mosley points to may create doubt surrounding B.A.1's testimony about being molested by Mosley, but it certainly does not prove her testimony false.[16]   The trial in this matter took place in 2011.   B.A.1 recalled several incidents that she said took place between 2001 and 2003, when she would have been about 10-12 years old.[17]   It is quite

---

[15]   *State v. Mosley*, 2011-KA-1514 (La. App. 4 Cir. 3/13/13), 2013 La. App. Unpub. LEXIS 185 (emphasis added).

[16]   Mosley cites to the testimony of Ed Bolger, who runs the Federal Bureau of Prisons, the United States Justice Department, Rentry Program, and Defense Exhibit 21 (paperwork from the United States Probation Office regarding Mosley's federal custody).

[17]   State Rec., Vol. 6 of 10, Trial Transcript, pp. 184-188.

possible she was simply mistaken about the dates of the incidents.    Perjury is the offering of "false testimony concerning a material matter with the willful intent to provide false testimony, rather than as a result of confusion, mistake, or faulty memory."    *See United States v. Dunnigan*, 507 U.S. 87, 94 (1993).    Further, perjury is not established by mere contradictory testimony from witnesses or inconsistencies in a witness's testimony. *Kutzner v. Johnson*, 242 F.3d 605, 609 (5th Cir. 2001); *Koch v. Puckett*, 907 F.2d 524, 531 (5th Cir. 1990).    Contradictory testimony from witnesses or inconsistencies in a witness's testimony at trial are to be resolved by the trier of fact and do not suffice to establish that certain testimony was perjured.    *Koch*, 907 F.2d at 531.    Moreover, the record is clear that the State had no concrete or objective evidence to suggest that B.A.1's testimony that she was molested by Mosley was indeed false.    The jury was entitled to weigh her testimony, along with Bolger's testimony and the defense's evidence of Mosley's federal incarceration dates, and resolve any credibility issues with respect to B.A.1's testimony.

The same is true regarding B.A.1's testimony about Mosley molesting her younger sister in December 2004.    The defense offered the testimony of Ed Bolger, who explained that Mosley was in his custody in a "comprehensive sanction center" or "halfway house" between October 2004 and February 2005.    He explained that inmates were allowed to leave the premises and described the monitoring that would have been in place during that time.[18]    As the State points out in its response, the possibility existed for Mosley to have visited the home of B.A.1 during this time-period despite the restrictions to which he was

---

[18]  State Rec., Vol. 7 of 10, Trial Transcript (Ed Bolger), pp. 48-71.

subjected, and it was for the jury to weigh the evidence and resolve any credibility issues. Mosley has not shown that the testimony was false or that the prosecution was aware of any false testimony.    For the reasons expressed, federal *habeas* relief is not warranted on this claim.

   B.  *Ineffective Assistance of Counsel*

Mosley alleges that his trial counsel provided ineffective assistance in failing to object to improper jury instructions on general and specific intent.    He also asserts that defense counsel refused to let him testify on his own behalf at trial.    The claims were considered and rejected by the state courts applying the *Strickland* framework on post-conviction review.    The Louisiana Supreme Court denied relief incorporating the state district court's findings:

> The undersigned presided over Mr. Mosley's trial and has as much faith in its jury instructions as it did on the day it read them to the jury.    Had counsel objected to them, this objection would have been properly overruled.
> *    *    *    *
> As to the allegation that Mr. Mosley wished to testify at his trial but defense counsel would not permit it, there is nothing in the record or the application to support this.    Again, the undersigned presided over this trial and recalls the proceedings very clearly, and at no time was such a dispute about Mosley's desire to testify evident.

The United States Supreme Court has established a two-pronged test for evaluating claims of ineffective assistance of counsel.    Specifically, a petitioner seeking relief must demonstrate both that counsel's performance was deficient and that the deficient performance prejudiced his defense.    *Strickland v. Washington*, 466 U.S. 668, 697 (1984). A petitioner bears the burden of proof on such a claim and "must demonstrate, by a

preponderance of the evidence, that his counsel was ineffective." *Jernigan v. Collins*, 980 F.2d 292, 296 (5th Cir. 1993); *see also Clark v. Johnson*, 227 F.3d 273, 284 (5th Cir. 2000). If a court finds that a petitioner has made an insufficient showing as to either of the two prongs of inquiry, *i.e*, deficient performance or actual prejudice, it may dispose of the ineffective-assistance claim without addressing the other prong. *Strickland*, 466 U.S. at 697.

To prevail on the deficiency prong of the *Strickland* test, a petitioner must demonstrate that counsel's conduct fails to meet the constitutional minimum guaranteed by the Sixth Amendment. *See Styron v. Johnson*, 262 F.3d 438, 450 (5th Cir. 2001). "Counsel's performance is deficient if it falls below an objective standard of reasonableness." *Little v. Johnson*, 162 F.3d 855, 860 (5th Cir. 1998). Analysis of counsel's performance must take into account the reasonableness of counsel's actions in light of all the circumstances. *See Strickland*, 466 U.S. at 689. "[I]t is necessary to 'judge ... counsel's challenged conduct on the facts of the particular case, viewed as of the time of counsel's conduct.'" *Lockhart v. Fretwell*, 506 U.S. 364, 371 (1993) (quoting *Strickland*, 466 U.S. at 690). A petitioner must overcome a strong presumption that the conduct of his counsel falls within a wide range of reasonable representation. *See Crockett v. McCotter*, 796 F.2d 787, 791 (5th Cir. 1986); *Mattheson v. King*, 751 F.2d 1432, 1441 (5th Cir. 1985).

To prevail on the prejudice prong of the *Strickland* test, a petitioner "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694. In this context, a

reasonable probability is "a probability sufficient to undermine confidence in the outcome." *Id*. In making a determination as to whether prejudice occurred, courts must review the record to determine "the relative role that the alleged trial errors played in the total context of [the] trial." *Crockett*, 796 F.2d at 793.

Because the state courts rejected Mosley's ineffective-assistance-of-counsel claims on the merits and because such claims present a mixed question of law and fact, this Court must defer to the state court decision unless it was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States."    28 U.S.C. § 2254(d)(1); *Moore v. Cockrell*, 313 F.3d 880, 881 (5th Cir. 2002). In fact, the United States Supreme Court has held that, under the AEDPA, federal *habeas corpus* review of ineffective assistance of counsel claims must be "doubly deferential" in order to afford "both the state court and the defense attorney the benefit of the doubt." *Burt v. Titlow*, 134 S. Ct. 10, 13 (2013) (quoting *Cullen v. Pinholster*, 563 U.S. at 190).

Mosley's claim pertains to the following excerpted portion of the jury instructions:

Criminal intent may be specific or general. Specific criminal intent is that state of mind which exists when the circumstances indicate that the defendant actively desired the prescribed criminal consequences to follow his act or failure to act.

General criminal intent is present when the circumstances indicate that the defendant must have adverted to the prescribed criminal consequences as reasonably certain to result from his act or failure to act. General criminal intent is always present when there is specific intent. Whether criminal intent is present must be determined in light of ordinary experience.

> Intent is a question of fact which may be inferred from the circumstances. You may infer that the defendant intended the natural or probable consequences of his or her acts.[19]

He argues that the jury instruction was improper because the trial judge substituted the statutory term "offender" used in Louisiana Revised Statute 14:10, with the word "defendant," and also because "it allowed the jury to infer that the defendant intended the natural and probable consequences of his acts, thereby infringing on his presumption of innocence."[20]

As the state court determined, Mosley fails to show that the jury instruction was improper under Louisiana law. In fact, these same arguments have been considered and flatly rejected by Louisiana courts, which have held the instructions to be proper statements of law. *See State v. German*, 2012-1293 (La. App. 4 Cir. 1/22/14), 133 So.3d 179, 204; *State v. Leyva-Martinez*, 2007-1255 (La. App. 3 Cir. 4/30/08), 981 So.2d 276, 283-84. The record does not support Mosley's assertion that the trial court erroneously instructed the jury with regard to criminal intent. He therefore cannot establish that the failure to lodge an objection to a *proper* statement of the law constitutes deficient performance. Counsel does not render constitutionally ineffective assistance by failing to raise a meritless objection. *See Johnson v. Cockrell*, 306 F.3d 249, 255 (5th Cir. 2002) (citing *Koch v. Puckett*, 907 F.2d 524, 527 (5th Cir. 1990) ("This Court has made clear that counsel is not required to make futile motions or objections."); *Clark v. Collins*, 19 F.3d 959, 966 (5th Cir. 1994).

---

[19] State Rec., Vol. 7 of 10, Trial Transcript, pp. 174-75.

[20] Rec. Doc. 3-1, p. 29.

Furthermore, as the state district court held, even assuming defense counsel had objected to the instructions as improper for the cited reasons, the objection would have been properly overruled.    Thus, Mosley has not shown a reasonable probability that the result of the proceeding would have been any different had counsel objected to the jury instructions. This claim is without merit.

Next, Mosley claims that counsel rendered ineffective assistance for failing to allow him to testify at trial.    The Court will assume that Mosley is arguing both that he was denied the right to testify by trial counsel and that counsel was ineffective for advising him not to testify.    The State argues that the state courts correctly rejected the claim that he was denied the right to testify as unsupported and conclusory.

A defendant has a fundamental constitutional right to testify.    *See Rock v. Arkansas*, 483 U.S. 44, 49–52, 107 S.Ct. 2704, 97 L.Ed.2d 37 (1987).    When a defendant contends that trial counsel interfered with his right to testify, "the appropriate vehicle for such claims is a claim of ineffective assistance of counsel."    *United States v. Mullins*, 315 F.3d 449, 452 (5th Cir. 2002) (internal quotation marks and citation omitted).    "[A] petitioner in a habeas proceeding cannot prevail on such a claim merely by stating to the habeas court that he told his trial attorney that he wished to testify and that his attorney forbade him from taking the witness stand."    *Turcios v. Dretke*, Civ. Action No. H-97-0515, 2005 WL 3263918, at *6 (S.D. Tex. Nov. 29, 2005) (citing *Underwood v. Clark*, 939 F.2d 473, 475-76 (7th Cir. 1991)); *accord Jones v. Cain*, Civil Action No. 10-213, 2010 WL 5375949, at *3 (E.D. La. Dec. 17, 2010) (Vance, J.); *Davis v. Quarterman*, Civil Action No. H-06-3606, 2007 WL 1886272, at *6 (S.D. Tex. June

29, 2007).   In addressing the need for a petitioner to substantiate a claim that he was

denied the right to testify by his counsel, the United States Seventh Circuit Court of Appeals

has explained:

> There is grave practical difficulty in establishing a mechanism that will protect a criminal defendant's personal right (that is, a right not waivable by counsel) to testify on his own behalf without rendering the criminal process unworkable. It is extremely common for criminal defendants not to testify, and there are good reasons for this, as we have seen. Yet it is simple enough after being convicted for the defendant to say, "My lawyer wouldn't let me testify. Therefore I'm entitled to a new trial." ...
>
> [A] barebones assertion by a defendant, albeit made under oath, is insufficient to require a hearing or other action on his claim that his right to testify in his own defense was denied him. It just is too facile a tactic to be allowed to succeed. Some greater particularity is necessary—and also we think some substantiation is necessary, such as an affidavit from the lawyer who allegedly forbade his client to testify—to give the claim sufficient credibility to warrant a further investment of judicial resources in determining the truth of the claim.

*Underwood v. Clark*, 939 F.2d 473, 475-76 (7th Cir. 1991); *accord Richthofen v. Cain*, Civ.

Action No. 05-5701, 2008 WL 630477, at *44-45 (E.D. La. Mar. 7, 2008); *Curtis v. Cain*, Civ.

Action No. 06-1676, 2008 WL 482849, at *8-9 (E.D. La. Feb. 13, 2008); *Baker v. Cain*, Civ.

Action No. 06-2039, 2007 WL 2174959, at *10-11 (E.D. La. July 26, 2007); *White v. Cain*, Civ.

Action No. 06-1576, 2006 WL 3703240, at *4-5 (E.D. La. Dec. 11, 2006); *Turcios v. Dretke*,

supra.    The United States Fifth Circuit Court of Appeals has cited favorably the rationale set

forth in *Underwood*.    *United States v. Martinez*, 181 F.3d 627, 628 (5th Cir. 1999); *Silva-

Garcia v. United States*, No. 10-cr-2224, 2012 WL 5464639, at *4 (S.D. Tex. Nov. 8, 2012).

Mosley asserts that he wanted to testify at trial, but defense counsel made the

decision not to call him as a witness and thus prevented him from testifying.    He alleges

that counsel "assured [him] that he did not need to testify because the jury would not find him guilty based on all the inconsistencies in the children's testimony."[21]    Nothing in the record indicates that he ever made his desire known to the trial court.    As the state district court noted, the record does not reflect that at any point during trial defense counsel refused to allow Mosley to testify contrary to Mosley's expressed desire to do so.    And while this alone does not end the inquiry, it clearly renders his assertion that defense counsel prohibited him from testifying, entirely unsupported and conclusory.    Moreover, even his own allegations suggest that Mosley merely acquiesced in his defense counsel's well-reasoned strategy and chose not to testify at trial.    The record before this Court shows that Mosley has never attempted to present any evidence to support his allegation that he wanted to testify, but trial counsel refused his request.

Furthermore, Mosley has not established that his counsel's advice against testifying was unreasonable.    A decision whether to put a criminal defendant on the stand "is a 'judgment call' which should not easily be condemned with the benefit of hindsight." *United States v. Garcia*, 762 F.2d 1222, 1226 (5th Cir. 1985); *accord United States v. Mullins*, 315 F.3d at 453; *Amos v. Cain*, Civ. Action No. 04-2029, 2008 WL 782472, at *11 (E.D. La. Mar. 20, 2008); *Curtis v. Cain*, 2008 WL 482849 at *10.    Such a matter is inherently one of trial strategy, and federal *habeas* courts generally are not to second-guess counsel's decisions on matters of trial tactics; rather, courts are to employ a strong presumption that counsel's conduct falls within a wide range of reasonable assistance and, under the circumstances,

---

[21]  Rec. Doc. 3-1, p. 23.

might be considered sound trial strategy.    *Strickland*, 466 U.S. at 689.    Mosley does not specify what testimony he would have offered if called to testify or precisely how his testimony would have been beneficial to the defense.    He simply alleges that the victims' testimony was untruthful and he "wanted to give his version of the purported incidents and provide a logical explanation for the jury."[22]    In doing so, however, Mosley would have been subjected to extensive cross-examination, including questions involving his prior criminal history, which could have undermined his credibility.    Instead of having Mosley testify, defense counsel wisely sought to establish inconsistencies and flaws in the State's case, which rested on the testimony of young children, and to offer contradictory testimony of other minors close to Mosley.    Defense counsel strategically considered the potential harm that plainly could outweigh any benefit his testimony might have provided the defense, and Mosley acquiesced.    For these reasons, Mosley has not established that counsel's advice against testifying was unreasonable.    Nor has he demonstrated that the outcome of the trial would have been any different but for counsel's decision to present a vigorous defense without Mosley's testimony.

    For the foregoing reasons, Mosley has not demonstrated that the state court's decision rejecting these ineffective-assistance-of-counsel claims was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States.

---

[22]  Rec. Doc. 3-1, p. 23.

## **RECOMMENDATION**

**IT IS RECOMMENDED** that Mosley's application for federal *habeas corpus* relief be **DISMISSED WITH PREJUDICE**.

A party's failure to file written objections to the proposed findings, conclusions, and recommendation in a magistrate judge's report and recommendation within fourteen (14) days after being served with a copy shall bar that party, except upon grounds of plain error, from attacking on appeal the unobjected-to proposed factual findings and legal conclusions accepted by the district court, provided that the party has been served with notice that such consequences will result from a failure to object. 28 U.S.C. § 636(b)(1); *Douglass v. United Services Auto. Ass'n*, 79 F.3d 1415, 1430 (5th Cir. 1996) (en banc).[23]

New Orleans, Louisiana, this   11th   day of _____ July _____, 2017.

_____
**MICHAEL B. NORTH**
**UNITED STATES MAGISTRATE JUDGE**

---

[23] *Douglass* referenced the previously applicable ten-day period for the filing of objections. Effective December 1, 2009, 28 U.S.C. § 636(b)(1) was amended to extend that period to fourteen days.